FILED

2019 Nov-19  AM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

QBE CORPORATE LIMITED,    *
                          *
        Plaintiff,        *
                          *    CIVIL ACTION NO. _____
v.                        *
                          *
LKLEE, LLC,               *
                          *
        Defendant.        *
                          *

## **COMPLAINT**

Plaintiff QBE Corporate Limited ("**QBE**") is one of Certain Underwriters at Lloyd's, London ("**Underwriters**") who subscribed to two policies of insurance (Policy No. 63946 and Policy No. 63966, collectively, the "**Policies**") issued to Defendant LKLEE, LLC ("**LKLEE**"), insuring LKLEE's buildings and business personal property and providing coverage for loss of business income and rental income.  QBE files this complaint for a declaratory judgment that QBE has no obligation under the Policies to pay LKLEE any further amounts due to LKLEE's failure and/or refusal to comply with its post-loss obligations under the Policies; to pay LKLEE for any alleged storm-related damage to its buildings beyond the amount QBE has already paid LKLEE for such damage; to pay LKLEE for any damage to its business personal property; or to pay LKLEE for any loss of business income or rental income.  This complaint also seeks a declaratory judgment that the Policies are void and LKLEE's claims forfeited due to LKLEE's fraud, and asks the Court to render a judgment for such other, further, or different relief in favor of QBE as may be warranted, the premises stated herein considered.  QBE's complaint is based on the following:

## PARTIES AND JURISDICTION

1.      Plaintiff QBE is a corporation organized and existing under the laws of England, with its registered office and principal place of business in London, England.  QBE is the sole capitol provider to Syndicate 1886, which is one of many syndicates that transact business in the marketplace known as Lloyd's of London.  Underwriters, including QBE through Syndicate 1886, subscribed to Policy No. 63946, issued to LKLEE, LLC for the policy period October 6, 2017 to October 6, 2018, and also subscribed to Policy No. 63966, issued to LKLEE, LLC for the policy period October 6, 2017 to October 8, 2018.  QBE, through Syndicate 1886, underwrote 21.5% of each of these Policies, and thus subscribed to 21.5% of the risk on the Policies.  Policy No. 63946 insures 16 buildings up to a certain limit for each building, with such limits ranging from $16,930.00 to $900,000.00, and also provides coverage for loss of business income and rental income with respect to 11 buildings up to a certain limit for each building, with such limits ranging from $420.00 to $130,810.00.  Policy No. 63966 insures business personal property located in two buildings, up to a limit of $50,000.00 for one building and $500,000.00 for the other.  LKLEE has demanded payment of, among other things, (a) the policy limits for damage to six buildings, totaling $2,165,730.00, (b) the policy limits for loss of business income (including rental income) from five buildings, totaling $153,354.00, and (c) $191,461.20 for damage to business personal property.  Though Underwriters, for reasons stated herein, do not owe these amounts, QBE's 21.5% share of the amounts demanded is $465,631.95 for damage to the buildings, $32,971.11 for loss of business income, and $41,164.16 for damage to business personal property, for a total of $539,767.22.  Based on the above, QBE is entitled to maintain this action without joining the other subscribers to the Policies and without regard to their citizenship.  See Corfield v. Dallas Glen Hills, LP, 355 F.3d 853, 864 (5th Cir. 2003);

Underwriters at Lloyd's, London v. Osting-Schwinn, 613 F.3d 1079, 1091-92 (11th Cir. 2010) (*dicta* agreeing with and endorsing holdings in Corfield and similar cases).

2.      Defendant LKLEE, LLC is a limited-liability company organized and existing under Alabama law, with its principal place of business in Decatur, Alabama.  The members of LKLEE, LLC are Lisa Kay Lee and James Isaac Lambert.  Lisa Kay Lee and James Isaac Lambert are citizens of Alabama; therefore, LKLEE, LLC is a citizen of Alabama.

3.      The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      The Court has jurisdiction of this action under 28 U.S.C. § 1332(a)(2), because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and because the action is between a citizen of a state and a citizen or subject of a foreign state.

## FACTS

5.      In or about 2017, LKLEE acquired a large tract of property at 401 14th Street, Decatur, Alabama  35601, upon which 16 buildings were located.  The largest building, a two-story structure with 29,000 square feet, housed a business called Skate Castle.  LKLEE took over this business when it bought the property.  The Skate Castle building included a roller-skating rink, arcade, laser-tag room, party rooms, and a snack bar, and a residential apartment.  The site also had an outdoor mini-golf course.  Other buildings were used as retail stores, office space, storage space, and self-storage units.  One building was a residence.

6.      Underwriters subscribed to Policy No. 63946, issued to LKLEE, LLC for the period October 6, 2017 to October 6, 2018, and also subscribed to Policy No. 63966, issued to LKLEE, LLC for the policy period October 6, 2017 to October 8, 2018.  Policy No. 63946 (hereafter the "**Building Policy**," attached as Exhibit "A") insured the 16 buildings and also provided coverage for loss of business income and rental income as to 11 buildings including the

Skate Castle building.  Policy No. 63966 (hereafter the "**Business Personal Property Policy**," attached as Exhibit "B") insured business personal property located in the Skate Castle building and one other building.

7.     In February 2017, before LKLEE bought the property, and again in December 2017, the Building Department of the City of Decatur (hereafter "Building Department") and/or the Alabama State Fire Marshall notified LKLEE's member and manager, Lisa Kay Lee, that LKLEE had to submit a Life Safety Plan, prepared by a licensed architect, for approval before LKLEE could perform any remodeling or renovation of the Skate Castle building.  The Building Department or the Fire Marshall issued a stop-work order to LKLEE in February 2018, apparently due to LKLEE's proceeding with work without an approved Life Safety Plan.

8.     On or about April 3, 2018, a storm reportedly damaged the roof of the Skate Castle building and some of the other buildings on LKLEE's property.  Wind speeds of 43 m.p.h. were recorded in Decatur, with a maximum wind gust of 72 m.p.h.

9.     On April 19, 2018, the Fire Marshall and/or Building Department conducted an inspection of the Skate Castle building and met with Lisa Kay Lee.  The Fire Marshall found multiple Fire Code violations and that LKLEE had modified the building without a Life Safety Plan.  The Fire Marshall's memorandum summarizing the inspection states:

Such issues include, but are not limited to:

- Total rearrangement of Kitchen, with addition of pizza ovens (no hood/suppression systems)
- Upstairs front area that used to be office now had what appeared to be full living conditions noted (Bathroom, Clothing, Bedding) along with an office.
- A 2-tiered laser tag room, that was once an outside storage room upon the last FM/Building Dept. inspection.
- Need for removal of door latches, and need for EXIT signage/Emergency Illumination at the rear (Bouncy) area.
- Multiple extension cords/strips in use throughout the facility.

- Need for Fire Alarm and/or Sprinkler System in certain areas (to be dictated by Code and the Design Professional)

We discussed the findings with Ms. Lee, and expressed. again the primary need to have a Design Professional go through the facility and understand from her what her wishes were to do in the facility, so this could be done safely and with appropriate permitting. She advised us someone was coming from a firm that afternoon to follow-up on the life safety sheet. Ms. Lee was advised that failure to comply could result with [Alabama State Fire Marshall] Pilgreen issuing an order to close the facility. She was advised that she nor anyone else should be living on the premises....

As of yesterday afternoon, we received a group text that we should receive a pdf copy of a life safety plan by Monday.  If we do not receive these plans within a timely manner, I think our next course of action would be to see how FM Pilgreen wishes to proceed.  My biggest concern is the fire hazard due to the huge amount of improper electrical, and being used as a residence.  There's so much stuff in this upstairs area it would be near impossible to exit if on fire....

There is no mention in the Fire Marshall's memorandum of any damage from the April 3, 2018

storm.

10.     On April 20, 2018, the Building Department sent LKLEE a letter stating:

This letter is in response to a site visit conducted on 4/20[/]18 at your location at approximately 11 o'clock A.M.  At the time of this visit you were informed of the pending action that will be taken at your location in response to the life safety violations witnessed during multiple visits from various departments within the City and State.

- Multiple times you were informed of the requirement to provide a "life Safety Plan" to perform the modifications that you were issued a Stop Work Order for on 2/28/18
- Due to the lack of a "life Safety Plan" and your modification to this area you were informed not to use the "Laser Tag Arena" until this plan has been provided, proper building permits issued, and any additional work required by the plan has been completed
- You were also informed to de-energize any none essential circuits that were added without permits, these circuits include but are not limited to: Pizza Ovens, upstairs residential area, and kitchen area
- All areas with exposed electrical wiring must be made safe with proper covers
- All extension cords used to power loungers must be removed and put into proper electrical outlets before this area can be used.
- All added lighting that was improperly placed on the trampoline and gyro chair must he removed before these areas can be used.

5

- At this time with the magnitude of the alterations to the building and the lack of a life safety plan the occupancy will be limited to 100 occupants for the entire building. this also include staff.
- Until the building can be made safe, you must provide a fire watch at all times during your times of operation and records of this watch must be maintained

If a life safety plan is not received by 12 o'clock PM Monday April 23'rd 2018, and the beginnings of the permit process began; we will have no choice but to begin the proceedings of revoking the-current certificate of occupancy and removing utilities-from the building.

There is no mention in the Building Department's letter of any damage from the April 3, 2018 storm.

11.     On or about April 26, 2018, LKLEE, through its insurance agent, first notified Underwriters that the April 3, 2018 storm had damaged its property – specifically that the "roof on skate ring [sic]" sustained "roof damage" and was "leaking."

12.     On or about April 27, 2018, the Building Department sent LKLEE a letter confirming that LKLEE had agreed to voluntarily close Skate Castle to the general public effective that day at 1:00 p.m.  The Fire Marshall summarized that "[t]he short of it is that [the building] will have a fully operational fire alarm system and the electrical concerns will be fixed before [Skate Castle] is allowed to open back up."

13.     Despite the issues noted by the Fire Marshall and Building Department and their having advised LKLEE that failure to comply with their directives could or would result in their closing Skate Castle, after LKLEE submitted its insurance claim, LKLEE maintained that it had to close Skate Castle due to the storm on April 3, 2018, and claimed loss of business income in addition to building damage.  Also, on May 14, 2018, LKLEE claimed damage to the Skate Castle building's fire-alarm system, HVAC units, sound system, and other electronic and network systems and contents.  LKLEE also claimed lost rental income from other buildings as a result of damage from the storm.

14.      Underwriters appointed Cramer, Johnson, Wiggins & Associates, Inc. ("**CJW**") to administer LKLEE's claim, and VeriClaim, Inc. ("**Vericlaim**"), an independent adjuster, to investigate and adjust the claim.  Underwriters also engaged independent consultants to assist with the investigation and adjustment, including a forensic meteorologist with Atlantic States Weather, Inc. ("**ASW**") and various experts with Madsen, Kneppers & Associates, Inc. ("**MKA**"), a construction-consultant-and-engineering firm.

15.      MKA inspected all buildings on LKLEE's property, except two as to which LKLEE claimed no wind damage, on May 31-June 1, 2018.  Lisa Kay Lee, LKLEE's member and manager, and Jerry L. Smith of LKLEE's contractor Jerry L. Smith & Associates, Inc. ("**Smith**") were present for the inspection.  Of the 14 buildings inspected, MKA either observed or was shown photographs of "minimal wind related damage to the exterior envelopes of" five buildings including the Skate Castle building, water-affected wall paneling, stained ceiling tiles, and wet ceiling insulation in certain parts of the Skate Castle building, and stained ceiling tiles in one or more other buildings.  Carpet on interior floors and walls of the Skate Castle building that reportedly sustained water damage as a result of the April 3, 2018 storm had been removed, and LKLEE also advised MKA that LKLEE had replaced water-damaged ceiling tiles.  MKA also observed deteriorated or rotten wood and other damage or signs of damage from long-term water intrusion.  MKA observed no wind-related damage to the other nine buildings.

16.      Prior to the inspection on May 31-June 1, 2018, LKLEE had the interior, wood-framed, residential apartment at the south end of the Skate Castle building demolished and removed.  LKLEE advised MKA that LKLEE removed the apartment as directed by city officials as a result of water damage affecting the structural integrity of the apartment.

PD.27401719.1

17.     During the inspection on May 31-June 1, 2018, LKLEE presented MKA with a May 10, 2018 estimate by LKLEE's contractor, Smith, for $417,043.00, and later submitted a June 4, 2018 estimate by Smith for $676,015.00.  These estimates, however, included items LKLEE wanted repaired, replaced, or installed, whether related to the April 3, 2018 storm or not. For example, the estimates included complete removal and replacement of the roofs of buildings that sustained only minimal wind-related damage from the storm, complete removal and replacement of the roofs of other buildings that had not been damaged by the storm, repairs to the skate-rink floor that pre-existed the storm, repairs to Skate Castle's marquee sign not damaged by the storm, installation of the new fire-alarm system required by the Fire Marshall and Building Department, and replacing ceramic tile in the Skate Castle building's bathrooms.

18.     During the inspection on May 31-June 1, 2018, LKLEE claimed damage to "DJ booth electronics," massage chairs, roller skates, and laser-tag systems from the storm.

19.     During the inspection on May 31-June 1, 2018, MKA observed electricians installing new wiring and conduit throughout the Skate Castle building, associated with the new fire-alarm system.  LKLEE claimed that the new fire-alarm system was being installed in response to city requirements related to water damage from the storm.

20.     MKA conducted another inspection on June 25, 2018.  MKA observed and/or was advised that after the April 3, 2018 storm, LKLEE had repaired parts of the roof on one building in addition to the five that MKA had initially identified as having minimal wind-related roof damage.

21.     At the June 25, 2018 inspection, LKLEE claimed that Skate Castle's sound system, lighting system, fire-alarm system, two arcade games, mobile gyro machine, two massage chairs, and point-of-sale system were not functioning properly due to the April 3, 2018

8

storm.  MKA inspected these and other contents, as well as HVAC units for the Skate Castle building, previously reported as damaged.  MKA found that the sound and lighting systems were partially functioning and had no signs of water damage.  MKA could not substantiate that any disfunction was the result of water damage from the storm.  MKA observed no signs of water damage to the fire-alarm panelboards.  MKA was unable to test the arcade games or mobile gyro machine because LKLEE put them in a location distant from a power source, but saw no signs of water damage to the games or machine.  MKA and/or Vericlaim tested the massage chairs and found them functioning properly.  MKA was unable to test the components of the point-of-sale system, which were unplugged and located in Lisa Kay Lee's residence on the property.  MKA found no signs of water intrusion in electrical-distribution panelboards.  Though two of the HVAC units were not functioning, MKA was unable to substantiate that the April 3, 2018 storm caused the disfunction.  The other two units were "short cycling," which is "typical [of] mechanical issues within the system."

22.     Following the June 25, 2018 inspection, MKA recommended payment for repair or replacement of damaged portions of the roofs on the six buildings that had minimal wind-related damage, for ceiling tiles in several buildings, and for wall panels, insulation, vinyl floor tiles, and, based on LKLEE's representations during the inspection, carpet on floors and walls in the Skate Castle building that had been removed prior to the inspection.  MKA did not recommend payment for any of the contents that LKLEE claimed to have been damaged by the April 3, 2018 storm, or for the HVAC units.  MKA's report to VeriClaim also stated:

> Based on our review of the documentation and correspondence from the City of Decatur building officials, the outlined ordinance violations have no relation to the storm damage and repairs.  The outlined violations are in response to ongoing life safety issues and the multiple interior building alterations completed by the insured after purchase of the property (which predates the April 3, 2018 storm event).

We find the following items as observed during our inspections at the Skate Castle Building to be unrelated to the storm damage repair scope:

- Repairs/upgrades to the building electrical systems
- Installation of the upgraded fire alarm system
- Removal of the south (rear) wood framed second level apartment

It is our understanding through review of the building official's documentation that the insured voluntary closed for business in order to rectify the multiple violations outlined by the city officials.  It is our opinion that completion of the specific storm damage repair scope of work would not have required closing of the business.

23.     Following MKA's June 25, 2018 inspection, on June 27, 2018, LKLEE submitted a two-page list of contents that LKLEE claimed to have been damaged as a result of the April 3, 2018 storm.  The list included, in addition to contents previously claimed as damaged and other new items, more than 700 skates.  MKA saw and photographed the fully stocked skate-rental room during its inspections.  The skates had no water damage.  At another, later inspection on October 1, 2018, MKLEE showed MKA and/or Vericlaim skates in a storage area.  The skates had no water damage.

24.     MKA calculated the Replacement Cost Value of the damaged property for which MKA recommended payment as $149,161.82, and the Actual Cash Value of the damaged property as $102,508.66.   Underwriters paid LKLEE a total of $150,000.00 in good-faith advances, pending further investigation.   MKA's calculations and Underwriters' payments included an allowance for LKLEE to independently test any electrical equipment or systems that it believed were damaged as a result of the storm, so that LKLEE, at Underwriters' expense, could provide any additional information to Underwriters that LKLEE wished for Underwriters to consider.  LKLEE accepted Underwriters' payments but contended that Underwriters owed LKLEE more than what Underwriters paid.

25.     Underwriters had already, by letter from their counsel dated June 19, 2018, requested that LKLEE produce documents related to LKLEE's insurance claim, as required by the provisions in Underwriters' Policies stating that LKLEE must cooperate in Underwriters' investigation and "[a]s often as may be reasonably required, permit us to…examine your books and records" and "permit us to make copies from your books and records."  Counsel's letter specifically requested:

1.     To the extent not already produced to Lauren Mullen at VeriClaim, copies of any executed lease agreement(s) and all related documentation and communications between the Insured and any existing or prospective tenant of the Insured, regarding cancellation of any lease at **any building** on the Subject Property since the Storm that the Insured claims as damage caused by the Storm, including full contact information for each identified existing or prospective tenant and the specific building at issue.

2.     To the extent not already produced to Mr. Pitts with VeriClaim, all reports, correspondence (including emails), other documents, photographs, or videography concerning or relating to any loss or damage to the **Skate Castle** caused by the Storm.

  a.     To the extent not already produced to Mr. Pitts with VeriClaim, all reports, correspondence (including emails), other documents, photographs, or videography concerning or relating to any loss or damage to **any other building** at the Subject Property caused by the Storm.

3.     To the extent not already produced to Mr. Pitts with VeriClaim, all reports, correspondence (including emails), other documents, photographs, or videography concerning or relating to any loss or damage to any business personal property in the **Skate Castle** caused by the Storm.

  a.     To the extent not already produced to Mr. Pitts with VeriClaim, all reports, correspondence (including emails), other documents, photographs, or videography concerning or relating to any loss or damage to any business personal property in **any other building** at the Subject Property caused by the Storm.

4.     A complete inventory, including quantities, costs, values and amount of loss claimed, of all electrical or mechanical systems or equipment in the **Skate Castle** that the Insured claims were damaged by the Storm, including but not limited to, the Skate Castle's "fire alarm system ... HVAC units ... sound system ... alarm

system ... [and] other electronic and network systems[,]" along with any estimates or quotes obtained by the Insured to repair or replace those systems or equipment.

> a.   A complete inventory, including quantities, costs, values and amount of loss claimed, of all electrical or mechanical systems in **any other building** at the Subject Property that the Insured claims were damaged by the Storm along with any estimates or quotes obtained by the Insured to repair or replace those systems or equipment.

5.   All contracts, bills, quotes, estimates, evidences of payment, correspondence, and other documents concerning or relating to any work quoted or performed on the **Skate Castle** by the Insured or any contractor or other third-party since the Storm that the Insured claims as damage caused by the Storm.

> a.   All contracts, bills, quotes, estimates, evidences of payment, correspondence, and other documents concerning or relating to any work quoted or performed on **any other building** at the Subject Property by the Insured or any contractor or other third-party since the Storm that the Insured claims as damage caused by the Storm.

6.   A complete inventory of all contents in the **Skate Castle** that the Insured claims were damaged due to the Storm, including quantities, costs, values and amount of loss claimed.

> a.   A complete inventory of all contents in **any other building** at the Subject Property that the Insured claims were damaged due to the Storm, including quantities, costs, values and amount of loss claimed.

7.   Copies of any plans or permit applications with all supporting documentation submitted by the Insured to the City of Decatur in connection with the **Skate Castle** at any time since the Insured's purchase of the Subject Property.

8.   Copies of any life safety plans obtained by the Insured or submitted by the Insured to the City of Decatur in connection with the **Skate Castle** at any time since the Insured's purchase of the Subject Property.

9.   Copies of all correspondence and documents exchanged between the Insured and the City of Decatur concerning the evaluation, inspection, or permitting of the **Skate Castle** and any work proposed or required to be performed on the **Skate Castle** at any time since the Insured's purchase of the Subject Property.

Also, on July 10, 2018, VeriClaim sent LKLEE an email requesting:

- Rent roll for each month since the date of property acquisition through the present.

PD.27401719.1

- Any monthly profit and loss statements or detail to monthly revenue and expenses amounts from the date of the property acquisition through the present.
- Date each of the claimed retail spaces was last occupied.
- All correspondence with expected tenants regarding lease terms.
- Copies of any executed leases for the claimed spaces, if any.
- Any and all communications regarding lease cancellations.

Additionally, we ask that you please provide the following documentation related to the claimed business income loss at Skate Castle:

- Detail to weekly contract labor and internal payroll expense for the period of May 2018 through the present.

Also, on July 18, 2018, VeriClaim asked LKLEE to "provide any correspondence, i.e. letters, emails, etc., from any government official or regulatory body that indicates you closed the Skate Castle because of the 4/3/18 storm," and to "provide…[the] names, address, phone numbers and email addresses of any lost tenants."

26.     Prior to or after these requests, LKLEE produced photographs of damage to the Skate Castle building; Smith's estimates that included complete removal and replacement of roofs that had not been damaged or only minimally damaged by the April 3, 2018 storm, and other work unrelated to any storm damage; Smith's invoices for work that was, in whole or in part, unrelated to any storm damage; estimates by Guaranty Roofing for removal and replacement of roofs on three buildings, at least one of which had not sustained any storm damage; the two-page list of contents of the Skate Castle building supposedly damaged by the storm; a document listing "Extra Expenses"; a June 7, 2018 email claiming lost rental income from two buildings (designated in the email as Buildings 1A and 8C); a spreadsheet containing rent-roll information for June and August 2018; a June 27, 2018 document claiming lost rent from four buildings (designated Buildings 1A, 4H [which LKLEE's previous email had stated was "vacant prior to the storm"], 5A/B [as to which LKLEE's previous email had stated, "tenant

13

still paying rent, but his business was negatively impacted by Skate Castle being closed"], and 8A/B [no lost rent claimed in LKLEE's previous email]); and a July 2, 2018 statement from a real-estate agent stating that "[p]rior to the storm damage on April 3rd, the following properties…were expected to be leased at Fair Market Value or greater, for a leasing period of 2-5 years[:]  4H [which LKLEE's previous email had stated was "vacant prior to the storm"], 1A, 8C, 2B [as to which LKLEE's previous email had stated, "no loss of income as not leased"], 2A [same statement as regarding 2B], 6A/B [as to which LKLEE's previous email had stated, "no damage"]," and that the agent was "unable to procure signed leases from expected tenants following the extensive storm damage" because the "potential tenants would not sign leases due to uncertainties of the re-opening of Skate Castle, which would bring customers to grow their business."

27.     LKLEE did not produce other documents or the inventories requested in Underwriters' counsel's June 19, 2018 letter or VeriClaim's July 10, 2018 email or July 18, 2018 letter.  Counsel and VeriClaim continued to request these and other documents in subsequent correspondence and emails to LKLEE.   LKLEE did not produce any additional documents or the requested inventories, as required by the Policies.

28.     By letter dated November 30, 2018, Underwriters through their counsel requested that LKLEE submit to an examination under oath of one or more of LKLEE's representatives, in accordance with the provision in Underwriters' Policies stating, "We may examine any insured under oath,…at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records."  The letter included a non-exclusive list of 22 topics that would or might be the subject of inquiry at the examination, and advised LKLEE that counsel would conduct the examination at the Courtyard Marriott in

Decatur on December 19, 2018 at 9:30 a.m.  The letter also requested that LKLEE produce certain additional documents at least seven days prior to the examination.

29.     By email dated December 3, 2018, Lisa Kay Lee of LKLEE advised Underwriters' counsel that "I will not meet in such circumstances, without an attorney, which I have not engaged," and that "I do not have the funds nor the time to find and prepare an attorney for December 19."  By email dated December 4, 2019, Ms. Lee advised Underwriters' counsel that "[a]s I previously stated, I do not have the funds, NOR WOULD THERE BE SUFFICIENT TIME, for me to engage an attorney that would have time to go over all the documents by December 19."

30.     By email dated December 18, 2018, Underwriters' counsel notified LKLEE that counsel was rescheduling the examination under oath for January 17, 2019 at 9:30 a.m. at the Courtyard Marriott in Decatur.  Counsel's email also once again asked that LKLEE produce the documents previously requested, at least seven days before the examination under oath.

31.     By email dated January 16, 2019, Lisa Kay Lee of LKLEE notified Underwriters' counsel, "I think I made it clear I am not in the position, financially, to 'lawyer up' for a sworn testimony."

32.     By letter dated January 17, 2019, Underwriters' counsel notified LKLEE that counsel was rescheduling the examination under oath for February 6, 2019 at 9:30 a.m. at the Courtyard Marriott in Decatur.

33.     By email dated February 5, 2019, Lisa Kay Lee of LKLEE advised Underwriters' counsel, "do not continue to request I meet for sworn testimony, without me being able to afford an attorney, which I CANNOT afford."

34.     By letter dated February 8, 2019, Underwriters' counsel notified LKLEE:

Underwriters renew their request for and urge LKLEE to produce the documents and information previously sought in our June 8, June 19, July 12, September 27, 2018, November 30, 2018, December 18, 2018, and January 17, 2019 letters on behalf of Underwriters and in Vericlaim's June 24, July 18, and November 7, 2018 correspondence on behalf of Underwriters, as required under the Policies. Underwriters likewise renew their request for and urge LKLEE to present for EUO, as required under the Policies. <u>Should LKLEE fail to produce the requested documentation or fail to respond in writing to bo.williams@phelps.com by Friday, February 15, 2019, advising of LKLEE's agreement to present for EUO, Underwriters will have no choice but to conclude their investigation and evaluation and consider these failures as a breach of the Policies' cooperation clauses and of the Policies' enumerated EUO and document production requirements, which could result in denial of LKLEE's Claims under the Policies and Alabama law.</u>

(Emphasis added).

35.    LKLEE failed to respond to counsel's letter by February 15, 2019 (or thereafter), thereby refusing to provide an examination under oath.  Nor did LKLEE produce any additional documents.

36.    By letter dated May 9, 2019 (attached as Exhibit "C"), Underwriters' claim administrator, CJW, notified LKLEE of Underwriters' claim decision.  CJW advised LKLEE that LKLEE failed to cooperate with Underwriters' claim investigation, failed to produce documents and inventories as required by the Policies, and failed and refused to submit to an examination under oath as required by the Policies.  CJW also noted that Underwriters had paid LKLEE $150,000.00 in previous good-faith advances for building damage, and advised LKLEE that Underwriters had actually overpaid LKLEE's claim because Underwriters owed less than $75,000.00 as a result of coinsurance penalties provided for in Underwriters' Policies; that Underwriters also had no obligation to pay Replacement Cost Value but only Actual Cost Value unless and until LKLEE actually made repairs, and not all repairs had been made; and that Underwriters denied any further payment for damage to LKLEE'S buildings.  CJW also advised LKLEE that Underwriters denied payment of LKLEE's claims for loss of business income and

16

rental income because, "[b]ased on Underwriters' investigation, LKLEE did not sustain any such loss due to "necessary 'suspension' of [LKLEE's] 'operations…caused by direct physical loss" or caused by or resulting from a "Covered Cause of Loss."  CJW also advised LKLEE that Underwriters denied payment of LKLEE's claims for damage to business personal property because "Underwriters' investigation does not substantiate [LKLEE's business personal property] Claim for any loss or damage allegedly sustained during the April 3, 2018 storm from a Covered Cause of Loss."  CJW also advised LKLEE that Underwriters reserved the right to deny coverage, declare the Policies void, or seek reimbursement for previous payments made to LKLEE on account of violations of the Policies' "Concealment, Misrepresentation or Fraud" condition and "Fraudulent Claim Clause."

### A JUSTICIABLE CONTROVERSY EXISTS WHICH THE COURT MAY RESOLVE BY RENDERING A DECLARATORY JUDGMENT

37.    On November 4, 2019, counsel for LKLEE disputed Underwriters' denying LKLEE's claims and demanded payment of, among other things, (a) the policy limits for damage to six buildings, totaling $2,165,730, (b) the policy limits for loss of business income from five buildings, totaling $153,354.00, and (c) $191,461.20 for damage to business personal property.

38.    There is an actual, existing, justiciable controversy between Underwriters and LKLEE as to their respective rights and obligations under the Policies, which the Court may resolve by rendering a declaratory judgment.

### QBE DOES NOT OWE ANY FURTHER PAYMENT FOR BUILDING DAMAGE, AND DOES NOT OWE PAYMENT FOR LOSS OF BUSINESS INCOME OR RENTAL INCOME OR FOR DAMAGE TO BUSINESS PERSONAL PROPERTY

39.    The Building Policy and the Business Personal Property Policy include, among other forms, a "BUILDING AND PERSONAL PROPERTY COVERAGE FORM," a "CAUSES OF LOSS — SPECIAL FORM," a form titled "COMMERCIAL PROPERTY CONDITIONS,"

PD.27401719.1

and a number of endorsements.  The Building Policy also includes a "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM."

40.   Section E., "Loss Conditions," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM," and § D., "Loss Conditions," of the "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM," state:

> *The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.*
>
> ***
>
> *3.   Duties In The Event Of Loss Or Damage*
>
> *a.   You must see that the following are done in the event of loss or damage to Covered Property:*
>
> ***
>
> *(5)   At our request, give us complete inventories of the damaged and undamaged property.  Include quantities, costs, values and amount of loss claimed.*
>
> *(6)   As often as may be reasonably required, permit us to…examine your books and records*
>
> .
>
> *Also…permit us to make copies from your books and records.*
>
> *(8)   Cooperate with us in the investigation or settlement of the claim.*
>
> *b.   We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records....*

LKLEE breached the conditions requiring LKLEE to cooperate with Underwriters in the investigation of the claim, to submit to an examination under oath, to permit Underwriters to examine and make copies from LKLEE's books and records, and to provide complete inventories of the damaged property, including quantities, costs, values, and amount of loss

claimed.   Therefore, QBE does not owe coverage or any further payment for damage to LKLEE's buildings, does not owe coverage or payment for LKLEE's loss of business income or rental income, and does not owe coverage or payment for damage to LKLEE's business personal property.

41.   Section A., "Coverage," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM" states that Underwriters "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss."   QBE does not owe coverage for any loss or damage sustained or incurred by LKLEE that was not caused by direct physical loss or damage to Covered Property. Such losses and damages include but are not necessarily limited to the closure of Skate Castle; loss of business income due to closure of Skate Castle; loss of rental income from other buildings due to closure of Skate Castle; loss as a result of having to install a new fire-alarm system in the Skate Castle building, of having to (or electing to) remove the apartment from the Skate Castle building, or of having to comply with other directives of the Fire Marshall or Building Department, because none of these losses or damages were caused by direct physical loss or damage to the Skate Castle building or other buildings.

42.   Section A.3., "Covered Causes Of Loss," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM" states:  "See applicable Causes of Loss Form as shown in the Declarations."  Likewise, § B., "Exclusions And Limitations," states:  "See applicable Causes of Loss Form as shown in the Declarations."  Part 4. of the Declarations, under "Coverage," states "SEE ATTACHED SCHEDULE."  The attached Schedule identifies the applicable Causes of Loss Form as "Special."  Thus, the "CAUSES OF LOSS — SPECIAL FORM" is the applicable form setting forth what are Covered Causes of Loss.   QBE does not owe coverage for any

damage sustained or incurred by LKLEE that was not caused by or did not result from a Covered Cause of Loss.

43.     The "CAUSES OF LOSS — SPECIAL FORM" states:

A.     *Covered Causes Of Loss*

*When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:*

    1.     *Excluded in Section B., Exclusions; or*

    2.     *Limited in Section C., Limitations; that follow.*

B.     *Exclusions*

    I.     *We will not pay for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.*

        a.     *Ordinance Or Law*

        *The enforcement of any ordinance or law:*

            (1)     *Regulating the construction, use or repair of any property; or*

            (2)     *Requiring the tearing down of any property, including the cost of removing its debris.*

        *This exclusion, Ordinance Or Law, applies whether the loss results from:*

            (1)     *An ordinance or law that is enforced even if the property has not been damaged; or*

            (2)     *The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.*

    2.     *We will not pay for loss or damage caused by or resulting from any of the following:*

\*\*\*

d.    (1)    *Wear and tear;*

        (2)    *Rust, corrosion,...decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;*

                \*\*\*

        (6)    *Mechanical breakdown, including rupture or bursting caused by centrifugal force...*

                \*\*\*

f.    *Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.*

                \*\*\*

3.    *We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c....*

                \*\*\*

b.    *Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.*

c.    *Faulty, inadequate or defective:*

                \*\*\*

        (2)    *Design, specifications, workmanship, repair, construction, renovation, remodeling...;*

                \*\*\*

        (4)    *Maintenance;*

        *of part or all of any property on or off the described premises.*

C.    *Limitations*

*The following limitations apply to all policy forms and endorsements, unless otherwise stated.*

PD.27401719.1

1.   *We will not pay for loss of or damage to property, as described and limited in this section.  In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.*

\*\*\*

c.   *The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain…, whether driven by wind or not, unless:*

(1)   *The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain…enters….*

Exclusion B.1.a., "Ordinance or Law," exclusion B.3.b., for governmental acts, and exclusion 3.c.2., for faulty, inadequate, or defective design, specifications, workmanship, repair, construction, renovation, or remodeling, bar coverage for any loss or damage, including but not necessarily limited to loss of business income or rental income, caused by or resulting from the Fire Marshall's or Building Department's enforcement of fire or other codes or the Fire Marshall's or Building Department's requiring LKLEE to install a new fire-alarm system, to correct other code violations, to re-do or undo work done without an approved Life Safety Plan or without other required approval or permits, to comply with the Fire Marshall's or Building Department's other directives, or to comply with any other ordinance or law.  Exclusions B.2.d.(1) and (2), and (6), for wear and tear, hidden or latent defect, any quality in property that causes it to damage or destroy itself, and mechanical breakdown, bar coverage for the nonfunctioning or partially functioning HVAC units and for damage to any business personal property resulting from such causes.  Exclusions B.2.d.(1) and (2), for wear and tear, decay, or deterioration, exclusion B.3.c.(4), for continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more, exclusion B.3.c.(4), for faulty, defective, or inadequate maintenance, and limitation C.1.c.(1), for rainwater intrusion resulting from something other

22

than a Covered Cause of Loss, bar coverage for any loss or damage that was not caused by wind from the April 3, 2018 storm but instead by water intrusion resulting from wear and tear, decay, or deterioration of roofing or wood, for loss or damage caused by long-term water intrusion, and for loss or damage caused by water intrusion resulting from failure to maintain the roofing.

44.     Section A.4., "Additional Coverages," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM," at part e., provides coverage for "Increased Cost of Construction," as follows:

e.      *Increased Cost Of Construction*

(1)     *This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.*

(2)     *In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this Additional Coverage.*

(3)     *The ordinance or law referred to in e.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.*

(4)     *Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:*

(a)     *You were required to comply with before the loss, even when the building was undamaged; and*

(b)     *You failed to comply with.*

***

*The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less....*

*The amount payable under this Additional Coverage is additional insurance.*

23

*With respect to this Additional Coverage:*

      (a)    *We will not pay for the Increased Cost of Construction:*

            (i)    *Until the property is actually repaired or replaced, at the same or another premises; and*

            (ii)    *Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.*

***

    (8)    *This Additional Coverage is not subject to the terms of the Ordinance or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.*

    (9)    *The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law.  The amount payable under this Additional Coverage, as stated in e. (6) of this Additional Coverage, is not subject to such limitation.*

QBE does not owe coverage for any increased costs of construction because there was no damage to a building by a Covered Cause of Loss.  QBE also does not owe coverage for any increased costs incurred by LKLEE to comply with enforcement of an ordinance or law, including but not limited to fire or other codes, in the course of repair, rebuilding, or replacement of damaged parts of LKLEE's buildings, because LKLEE was required to comply with fire or other codes, ordinances, or laws before the April 3, 2018 storm, when the buildings were undamaged, and failed to comply with such codes, ordinances, or laws.  QBE also does not owe coverage for any such increased costs unless and until the property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years.  To the extent, if any, that QBE owes coverage, it would

only owe its 21.5% share of $10,000 or 5% of the Limit of Insurance applicable to the building, whichever is less.

45.    Section E., "Loss Conditions," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM" states in part as follows:

> 4.    *Loss Payment*
>
> a.    *In the event of loss or damage covered by this Coverage Form, at our option, we will either:*
>
> (1)    *Pay the value of lost or damaged property;*
>
> (2)    *Pay the cost of repairing or replacing the lost or damaged property, subject to b. below;*
>
> (3)    *Take all or any part of the property at an agreed or appraised value; or*
>
> (4)    *Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below.*
>
> *We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.*

The "Valuation Condition" in § E., "Loss Conditions," states in part as follows:

> 7.    *Valuation*
>
> *We will determine the value of Covered Property in the event of loss or damage as follows:*
>
> a.    *At actual cash value as of the time of loss or damage, except as provided in b., c., d., e. and f below.*
>
> ***
>
> *The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value even when attached to the building:*

25

(1)     *Awnings or floor coverings;*

(2)     *Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or*

(3)     *Outdoor equipment or furniture.*

However, § G., "Optional Coverages," states in part as follows:

2.     *Replacement Cost*

a.     *Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form.*

\*\*\*

d.     *We will not pay on a replacement cost basis for any loss or damage:*

(1)     *Until the lost or damaged property is actually repaired or replaced; and*

(2)     *Unless the repairs or replacement are made as soon as reasonably possible after the loss*

\* \* \*

e.     *We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:*

(1)     *The Limit of Insurance applicable to the lost or damaged property;*

(2)     *The cost to replace the lost or damaged property with other property:*

(a)     *Of comparable material and quality; and*

(b)     *Used for the same purpose; or*

(3)     *The amount actually spent that is necessary to repair or replace the lost or damaged property.*

\*\*\*

26

   f.  *The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.*

QBE does not owe coverage under the above provisions because there was no loss or damage covered by the Coverage Form.  QBE also does not owe replacement cost for any loss or damage unless and until the lost or damaged property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. Replacement cost does not include increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of property, so it does not include costs resulting from the Fire Marshall's or Building Department's enforcement of fire or other codes or from the Fire Marshall's or Building Department's requiring LKLEE to install a new fire-alarm system, to correct other code violations, to re-do or undo work done without an approved Life Safety Plan or without other required approval or permits, to comply with the Fire Marshall's or Building Department's other directives, or to comply with any other ordinance or law regulating the construction, use, or repair of property. To the extent, if any, that QBE owes replacement cost, it would only owe its 21.5% share of the least of the amounts set forth in 2.e.(1)-(3) above.

  46.  Section F., "Additional Conditions," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM" states in part as follows:

  F.  *Additional Conditions*

  *The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.*

   *1.  Coinsurance*

   *If a Coinsurance percentage is shown in the Declarations, the following condition applies.*

   a.  *We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage*

*shown for it in the Declarations is greater than the Limit of Insurance for the property.*

*Instead, we will determine the most we will pay using the following steps:*

*(1)   Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;*

*(2)   Divide the Limit of Insurance of the property by the figure determined in Step (1);*

*(3)   Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and*

*(4)   Subtract the deductible from the figure determined in Step (3).*

*We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.*

*Example No. 1 (Underinsurance):*

*When:   The value of the property is $250,000
The Coinsurance percentage for it is 80%
The Limit of Insurance for it is $100,000
The Deductible is $250
The amount of loss is $40,000*

*Step (1): $250,000 x 80% = $200,000 (the minimum amount of insurance to meet your Coinsurance requirements)*

*Step (2): $100,000 ± $200,000 = .50*

*Step (3): $40,000 x .50 = $20,000*

*Step (4): $20,000 — $250 = $19,750*

*We will pay no more than $19,750. The remaining $20,250 is not covered.*

*Example No. 2 (Adequate Insurance):*

*When:   The value of the property is $250,000
The Coinsurance percentage for it is 80%*

28

> *The Limit of Insurance for it is $200,000*
> *The Deductible is $250*
> *The amount of loss is $40,000*
>
> *The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%).  Therefore, the Limit of Insurance in this Example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).*

The Building Policy's Declarations list a "Coinsurance percentage" of 90% for each of the 16 buildings.  The value of each building damaged by wind during the April 3, 2018 storm at the time of loss, multiplied by the coinsurance percentage of 90%, is greater than the Limit of Insurance for each of those buildings.  Therefore, QBE would only owe its 21.5% share of that portion of the loss calculated as set forth in the "Coinsurance" provision.  Vericlaim's calculations of the amounts owed after applying the "Coinsurance" provision are included in attached Exhibit "C" at pp. 23-38.  Underwriters have already paid these amounts, and more, to LKLEE, and so has paid (and overpaid) LKLEE in full for building damage.  The Business Personal Property Policy's Declarations also list a "Coinsurance percentage" of 90% for BPP for each of the two buildings identified in the Declarations, so even if QBE owed coverage for damage to any business personal property, it would only owe its 21.5% share of the amount determined to be owed under the "Coinsurance" provision.

47.    Section A., "Coverage," of the Building Policy's "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" states:

> *Coverage is provided as described below for one or more of the following options for which a Limit of Insurance is shown in the Declarations:*
>
> *(i)    Business Income including "Rental Value"….*
>
> ***

PD.27401719.1

> *If option (i) above is selected, the term Business Income will include "Rental Value"....*

The Building Policy's Declarations include a single limit per building for "BI w/Extra Exp — incl rental," that is, for business income with extra expense including rental.  These limits, tied to business income, extra expense, and/or rental associated with some (but not all) of the buildings listed as Covered Property, are:

> *Building 1— $6,600*       *Building 7— $32,964*       *Building 11 — $420*
>
> *Building 3 — $24,558*     *Building 8 — $46,517*      *Building 14 — $31,742*
>
> *Building 4 — $74,832*     *Building 9 — $14,400*      *Building 15 — $8,659*
>
> *Building 6 — $27,785*     *Building 10 — $130,810*

Thus, option (i) referenced above ("Business Income including 'Rental Value'") is applicable.

Section A. of the "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" further states:

> *We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.....*

Section A. defines "Business Income" as follows:

> *1.    Business Income*
>
> *Business Income means the:*
>
> *a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and*
>
> *b.    Continuing normal operating expenses incurred, including payroll....*

Section G., "Definitions," of the "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" defines "operations," "period of restoration," "rental value," and "suspension" as follows:

> 2.      *"Operations" means:*
>
> > a.      *Your business activities occurring at the described premises; and*
> >
> > b.      *The tenantability of the described premises, if coverage for Business Income including "Rental Value"…applies.*
>
> 3.      *"Period of Restoration" means the period of time that:*
>
> > a.      *Begins:*
> >
> > > (1)      *72 hours after the time of direct physical loss or damage for Business Income coverage; or*
> > >
> > > (2)      *Immediately after the time of direct physical loss or damage for Extra Expense coverage;*
> > >
> > > *caused by or resulting from any Covered Cause of Loss at the described premises; and*
> >
> > b.      *Ends on the earlier of:*
> >
> > > (1)      *The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or*
> > >
> > > (2)      *The date when business is resumed at a new permanent location.*
> >
> > *"Period of restoration" does not include any increased period required due to the enforcement of any ordinance or law that:*
> >
> > > (1)      *Regulates the construction, use or repair, or requires the tearing down of any property….*
>
> *** 
>
> 5.      *"Rental Value" means the:*

     a.     *Total anticipated rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, and*

     b.     *Amount of all charges which are the legal obligation of the tenant(s) and which would otherwise be your obligations, and*

     c.     *Fair rental value of any portion of the described premises which is occupied by you.*

6.     *"Suspension" means:*

     a.     *The slowdown or cessation of your business activities; or*

     b.     *That a part or all of the described premises is rendered untenantable, if coverage for Business Income including "Rental Value"…applies.*

Under the above provisions, QBE does not owe coverage for any loss of "Business Income" or "Rental Value" because such loss was not caused by direct physical loss of or damage to property or was not caused by or did not result from a Covered Cause of Loss, or for losses claimed for sums that are not "Business Income" or "Rental Value" as defined above, and because any losses claimed do not constitute actual loss of "Business Income" or "Rental Value" sustained by LKLEE due to necessary "suspension" of LKLEE's "operations" during the "period of restoration," as defined above.  Any loss of "Business Income" or "Rental Income" was instead caused by the Fire Marshall's or Building Department's enforcement of fire or other codes or by the Fire Marshall's or Building Department's requiring LKLEE to install a new fire-alarm system, to correct other code violations, to re-do or undo work done without an approved Life Safety Plan or without other required approval or permits, to comply with the Fire Marshall's or Building Department's other directives, or to comply with other ordinances or laws.

PD.27401719.1

48.     Section A. of the "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" also includes the following "Additional Coverages":

*3.     Additional Coverages*

*a.     Extra Expense*

*Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.*

*(1)     We will pay any Extra Expense to avoid or minimize the "suspension" of business and to continue "operations":*

> *(a) At the described premises...*

* * *

*(2)     We will pay any Extra Expense to minimize the "suspension" of business if you cannot continue "operations".*

*(3)     We will pay any Extra Expense to:*

> *(a)     Repair or replace any property; or*
>
> *(b)     Research, replace or restore the lost information on damaged valuable papers and records;*
>
> *to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form.*

QBE does not owe coverage or payment for any "Extra Expense" because such expense was not caused by direct physical loss or damage to property or was not caused by or did not result from a Covered Cause of Loss, or was not incurred during a "period of restoration," or was not incurred to avoid or minimize the "suspension" of business and to continue "operations," or was not incurred to repair or replace any property or research, replace, or restore the lost information on damaged valuable papers and records, or because LKLEE could have continued "operations."

33

49. Section A. of the "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" also includes the following "Additional Coverages":

3. *Additional Coverages*

\*\*\*

b. *Extended Business Income*

*(1)    Business Income Other Than "Rental Value"*

*If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:*

*(a)    Begins on the date property (except "finished stock") is actually repaired, rebuilt or replaced and "operations" are resumed; and*

*(b)    Ends on the earlier of:*

*(i)    The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or*

*(ii)    30 consecutive days after the date determined in (1)(a) above.*

*However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.*

*Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.*

*(2)    "Rental Value"*

*If the necessary "suspension" of your "operations" produces a "Rental Value" loss payable under this policy, we will pay for the actual loss of "Rental Value" you incur during the period that:*

> (a)   *Begins on the date property is actually repaired, rebuilt or replaced and tenantability is restored; and*
>
> (b)   *Ends on the earlier of:*
>
> > (i)   *The date you could restore tenant occupancy, with reasonable speed, to the level which would generate the "Rental Value" that would have existed if no direct physical loss or damage had occurred; or*
> >
> > (ii)   *30 consecutive days after the date determined in (2)(a) above.*
>
> *However, Extended Business Income does not apply to loss of "Rental Value" incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.*
>
> *Loss of "Rental Value" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.*

QBE does not owe coverage or payment for "Extended Business Income" because there is no "Business Income loss" or "Rental Value loss" payable under the Policy or produced by a necessary "suspension" or LKLEE's "operations," because there was no actual loss of "Business Income" or "Rental Value" during the period referenced in the above provisions, and because any "Business Income loss" or "Rental Value loss" was not caused by direct physical loss or damage at the described premises or was not caused by or did not result from a Covered Cause of Loss.

50.     Section D., "Loss Conditions," of the Building Policy''s "BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM" states:

> *5.     Loss Determination*
>
> ***
>
> *c.     Resumption Of Operations*

*We will reduce the amount of your:*

*(1)    Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including merchandise or stock) at the described premises or elsewhere.*

***

*d.    If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.*

QBE does not owe coverage for Business Income loss, but even if such coverage was owed, QBE would not owe coverage to the extent that LKLEE could have resumed operations in whole or in part, and would not owe coverage for more than the length of time it would have taken LKLEE to resume operations as quickly as possible.

51.    Section A.4., "Additional Coverages," of the "BUILDING AND PERSONAL PROPERTY COVERAGE FORM," at part a., provides coverage for "Debris Removal." However, part a. is supplanted by the following endorsement:

*DEBRIS REMOVAL ENDORSEMENT*

*THIS ENDORSEMENT CONTAINS PROVISIONS WHICH MAY LIMIT OR PREVENT RECOVERY UNDER THIS POLICY FOR LOSS WHERE COSTS OR EXPENSES FOR DEBRIS REMOVAL ARE INCURRED.*

***

*Any provision within this Policy (or within any other Endorsement which forms part of this Policy) which insures debris removal is canceled and replaced by the following:*

*1.    In the event of physical damage to or destruction of property, for which Underwriters hereon agree to pay, or which but for the application of a deductible or underlying amount they would agree to pay (hereinafter referred to as "Damage or Destruction), this Policy also insures, within the Sum Insured, subject to the limitations and method of calculation*

36

*below, and to all the other terms and condition of the Policy, costs or expenses;*

(a) *which are reasonably and necessarily incurred by the Assured in the removal from the premises of the Assured at which the Damage or Destruction occurred, of debris which results from the Damage or Destruction; and*

(b) *of which the Assured becomes aware and advises the amount thereof to Underwriters hereon within one year of the commencement of such Damage or Destruction.*

2. *In calculation the amount, if any, payable under this Policy for loss where costs or expenses for removal of debris are incurred by the Assured (subject to the limitations in paragraph 1 above):*

(a) *the maximum amount of such costs or expenses that can be included in the method of calculation set out in (b) below shall be the greater of US $25,000 (twenty-five thousand dollars) or 10% (ten percent) of the amount of the Damage or Destruction from which such costs or expenses result; and*

(b) *the amount of such costs or expenses as limited in (a) above shall be added to:*

(i) *the amount of the Damage or Destruction; and*

(ii) *all other amounts of loss, which arise as a result of the same occurrence, and for which Underwriters hereon also agree to pay, or which but for the application of a deductible or underlying amount they would agree to pay; and*

*the resulting sum shall be the amount to which any deductible or underlying amount to which this Policy is subject and the limit (or applicable sub-limit) of this Policy, shall be applied.*

QBE does not owe coverage for debris removal because it was not necessitated by or did not result from "physical damage to or destruction of property" covered by the Policies, because costs or expenses were not "reasonably and necessarily incurred by [LKLEE] in the removal from the premises of [LKLEE] at which the Damage or Destruction occurred, of debris which results from the Damage or Destruction," or because LKLEE did not become aware

and advise the amount thereof to Underwriters within one year of the commencement of such Damage or Destruction.   Even if coverage was owed for debris removal, such coverage would  be limited to an amount calculated as set forth in the above endorsement.

53.   The Policies include the following endorsement:

*EXCLUSION— TOTAL MOLD, MILDEW OR OTHER FUNGI*

*THIS ENDORSEMENT CHANGES THE POLICY.  READ IT CAREFULLY.*

*Notwithstanding any provisions to the contrary within the policy of which this endorsement forms a part, or within any other endorsement, which forms a part of this policy, we do not cover:*

a.      *Property damage; or*
b.      *Bodily injury; or*
c.      *Debris removal; or*
d.      *Loss of use; or*
e.      *Additional living expenses (ALE); or*
f.      *Medical payments to others; or*
g.      *Personal injury; or*
h.      *Business interruption losses; or*
i.       *Any increase in insured loss, damage, cost, or expense; or*
j.      *Any loss, cost, expense, fine, or penalty which is incurred , sustained or imposed by order, direction, instruction or request of or by agreement with any court, governmental agency or any public, civil or military authority, or threat thereof, (and whether or not as a result of public or private litigation); or*
k.      *Any loss, damage, cost or expense*

*in connection with or arising out of exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens.  Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss or damage.*

*The term "organic pathogen" or "organic pathogens" means any organic irritant or contaminant including but not limited to the following: mold, fungus, bacteria, or virus including but not limited to their by-products such as mycotoxins, mildew, or biogenic aerosol.  "Organic pathogen" includes but is not limited to the following fungi or mycotoxins produced by such fungi: Aspergillus, Penicillium, Stachybotrys chartarum, Trichodema, and Fusarium Memnoniella.*

\*\*\*

PD.27401719.1

*This exclusion includes but is not limited to (1) any cost, expense or charge to test, monitor cleanup, remediate, remove, contain, treat, detoxify, neutralise, rehabilitate, or in any way respond to or assess the effects of mold, mildew, mycotoxins, fungi, or organic pathogen; or (2) any cost, expense, or escape, exposure to, manifestation, appearance, presence, or growth of mold, mildew, mycotoxins, fungi or organic pathogens.*

QBE does not owe coverage for any loss, damage, or expense incurred by LKLEE, LLC, if any, in connection with or arising out of exposure to or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence or growth of mold, mildew, mycotoxins, fungi or organic pathogens.

54.     The Policies' "COMMERCIAL PROPERTY CONDITIONS" state:

*CONCEALMENT, MISREPRESENTATION OR FRAUD*

*This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at anytime.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:*

*1.     This Coverage Part;*

*2.     The Covered Property;*

*3.     Your interest in the Covered Property; or*

*4.     A claim under this Coverage Part.*

The Policies also include the following endorsement:

*FRAUDULENT CLAIM CLAUSE*

*If the (re)insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this contract shall become void and all claim hereunder shall be forfeited.*

LKLEE committed fraud and/or misrepresented a material fact concerning or relating to coverage or LKLEE's claim, or made a claim knowing same to be false or fraudulent as regards amount or otherwise.  As example, LKLEE claimed damage to more than 700 skates or pairs of skates when none were actually damaged, or certainly none that LKLEE was ever

39

able to show MKA and/or Vericlaim.  LKLEE also claimed that it had to close Skate Castle due to the storm on April 3, 2018, when it actually had to close due to code and Life Safety Plan issues raised by the Fire Marshall and Building Department.  LKLEE also claimed that the new fire-alarm system was being installed in response to city requirements related to water damage from the storm, when the new system was actually required regardless of any such water damage.  LKLEE also claimed that certain massage chairs were not functioning properly due to the April 3, 2018 storm when they were thereafter observed having been removed to Lisa Kay Lee's residence on the property in working order.

### **PRAYER FOR RELIEF**

Based on the above, QBE prays that the Court will declare (i) that QBE has no obligation under the Building Policy to pay LKLEE for any damage to LKLEE's buildings beyond the amount QBE has already paid LKLEE for such damage; (ii) that QBE has no obligation under the Building Policy to pay LKLEE for any loss of business income or rental income; (iii) that QBE has no obligation under the Business Personal Property Policy to pay LKLEE for any damage to its business personal property; and (iv) that the Policies are void and LKLEE's claims forfeited.  QBE further prays that the Court will render a judgment for such other, further, or different relief in favor of QBE as may be warranted, the premises considered.

/s/ A. Grady Williams IV
A. GRADY "BO" WILLIAMS IV
WILLIAM E. SHREVE, JR.
WILLIAM MOORER
Attorneys for Plaintiff

PD.27401719.1

OF COUNSEL:

PHELPS DUNBAR LLP
P. O. Box  2727
Mobile, AL  36652
(251) 432-4481
bo.williams@phelp.com
william.shreve@phelps.com
will.moorer@phelps.com


DEFENDANT IS TO BE SERVED BY PROCESS SERVER AS FOLLOWS:

Lisa Kay Lee
LKLEE, LLC
401 14th Street
Decatur, AL  35601

41